JACQUELINE A. NAQUIN, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILD, KALEB G. NAQUIN
v.
GERALD ROUSSEAU
No. 2007 CA 0565.
Court of Appeal of Louisiana, First Circuit.
November 2, 2007.
JACQUELINE A. NAQUIN, Plaintiff/Appellee, In Proper Person.
LESLIE J. CLEMENT, JR., Counsel for Defendant/Appellant Gerald Rousseau.
Before GAIDRY, McDONALD, and McCLENDON, JJ.
GAIDRY, J.
This is an appeal by the defendant, Gerald Rousseau,[1] from an Order of Protection, dated December 19, 2006, issuing a permanent injunction against him and in favor of the petitioner, Jacqueline Naquin, individually and on behalf of her minor son, Kaleb G. Naquin. The order prohibits Rousseau from stalking, harassing, contacting, or going within 100 yards of the petitioner's residence, place of employment, or the school attended by her minor son. After a thorough review of the record and applicable law, we affirm.

FACTUAL BACKGROUND
Ms. Naquin, aged 45, and the defendant, aged 68, are neighbors, living three houses away from each other. They were friends for a short time, but Ms. Naquin became uncomfortable with some of the defendant's behavior and told him she did not want to have anything further to do with him. According to Ms. Naquin, the defendant told her that he loved her and that he "wanted more." Ms. Naquin told him that as she had considered them to be just friends and since he indicated he wanted more out of the relationship, it was best that they have no further contact. According to Ms. Naquin, "since that day, everything has started."
Specifically, Ms. Naquin, who was unrepresented, testified that Rousseau began watching her constantly and going to his mailbox repeatedly throughout the day to keep an eye on her whereabouts. She testified that whenever she left her house, he left his house and followed her in his car. She also testified that when she was inside, the other neighbors would call her and tell her the defendant was outside, around her house, peeking through the doors and windows of her house.
Ms. Naquin testified that she is employed by Lafourche ARC, and one of her duties was to pick up a client who lived nearby, on a dead-end street. She stated that on several occasions, she, as well as some of the people she works with, saw the defendant in his car, circling the dead-end street and waiting on the corner next to where she worked.
On one particular occasion, she testified that the defendant actually went into her place of employment and alleged to the people she worked with that she had been purchasing illegal drugs on company time with recipients (clients of LaFourche ARC) in her vehicle with her. He also alleged that she had a man she was seeing hiding in the back seat of her car during employment time when she had a recipient with her. He further claimed that she was incoherent one day while on the job, had given him money to purchase someone else's prescription, and then she took that medication. Ms. Naquin read into the record a letter her employer had written detailing this incident.
At times, the defendant would be waiting in parking lots along Ms. Naquin's route to work or to her son's school, and would pull out and follow her whenever she drove by. At other times, he would simply follow her right out of the neighborhood to wherever she was going. She described another incident when she had left her home with her son and a friend of her son, and a neighbor told her he had later seen the defendant running out from beneath Ms. Naquin's carport.
She testified that she could not go outside her house without Rousseau watching her. In particular, she recounted an incident when she was washing her car on the other side of her house (so that he could not see her from his house), and she received a call from a neighbor informing her that the defendant was at her back yard, peeking through her fence.
Ms. Naquin testified that she was very concerned for her life and her safety as well as that of her son. She testified that her son cries often about being afraid, and that these actions by the defendant had her and her son living in such constant fear that they have both required counseling to deal with it.
Ms. Naquin also offered the testimony of one of her neighbors, Mr. John Tabor, who lived next door to the defendant. Mr. Tabor testified that he personally witnessed the defendant following Ms. Naquin as she was leaving her house "at least a half a dozen times." He stated that the defendant was "forever" watching Ms. Naquin and her home, and that he personally observed the defendant walking to and from his mailbox at least five or six times a day, even on Sundays. Mr. Tabor denied ever seeing the defendant peeping through Ms, Naquin's fence, windows, or doors, but testified that his wife had personally seen Rousseau doing so on several occasions. On cross-examination, Mr. Tabor candidly admitted that he and the defendant had their own personal problems, stemming from a boundary line dispute between their two houses. However, Mr. Tabor testified that when the defendant first moved into the neighborhood, they were friendly and he helped the defendant move, and also was there for him when he had to be hospitalized for coming close to a diabetic stroke. However, Mr. Tabor said things started to "sour" between them when the defendant talked "nasty" and acted inappropriately with Mr. Tabor's wife, after which they wanted nothing to do with the defendant. The boundary dispute arose later.
After the presentation of Ms. Naquin's case, the defendant sought a directed verdict, which was denied by the trial court. Mr. Rousseau, the defendant, then testified. He testified that he and Ms. Naquin were very good friends and that, in his opinion, they were "dating." Although he admitted that they had never slept together, he testified that they ate together often and that he bought her many things. He considered her his girlfriend, but admitted that he apparently thought more of their relationship than she did. He claimed that after she told him she wanted nothing to do with him, he ceased all contact with her. In response to questioning regarding her allegations against him, Mr. Rousseau did not deny any of the facts, but basically testified that each of those instances was mere coincidence. He stated that he frequents a coffee shop near Ms. Naquin's workplace, and that he did not follow her; rather, those incidents occurred when he was headed to the coffee shop coincidentally at the same time she was heading to work.
Mr. Rousseau did admit that he went to Ms. Naquin's place of employment and told the people who worked with Ms. Naquin that she was on drugs; however, he testified that he did so out of concern for Ms. Naquin's child. He added that if she had gotten fired from her job because of it, he gladly would have paid her house note and car note and taken care of her until she found another job. Later, he testified that he realized what he had done was wrong and he "shouldn't have done that."
He admitted making several trips to his mailbox and explained he did so because he was looking for his disability check to arrive. When questioned about his Sunday trips to the mailbox, he stated he did not always remember to check on Saturdays. However, he denied ever peeking into Ms. Naquin's yard, or driving in circles in the dead-end street near her place of employment. He also denied trespassing or going to her home or yard, and testified he never went back to her house after she told him she wanted nothing to do with him. He claimed that prior to that, he was a "good man for her." He testified that he loaned her a car when hers was broken, bought her groceries and a bike for her child, took care of her child, and cut her grass all summer long. He testified that she cooked for him and woke him up at five every morning to go and have coffee with her, and that he would stay at her house until ten or eleven at night.
Rousseau admitted that he had been arrested and spent two days in jail after Ms. Naquin turned him in for alleged stalking. However, he claimed he never hurt her, or stalked her, and could not understand why she or her son would be afraid of him.

PROCEDURAL HISTORY
On December 4, 2006, Ms. Naquin, in proper person, filed a form "Petition for Protection from Abuse" pursuant to La. R.S. 46:2131 et seq. or La. R.S. 46:2151, naming Rousseau as defendant, in which she alleged her relation to Rousseau was "friends of [the] opposite sex." Under the form heading "Defendant abused petitioner in the following manner," Ms. Naquin checked off "stalked petitioner" and "other," which she specified as "follows me constantly" and "trespassing on property." She then provided written details of the most recent incident, when the defendant allegedly followed her to her son's daycare and rolled down his window and said, "I'm not following you." She also provided details of his constant following of her and instances where neighbors saw him running out of her yard or carport. She included an incident (which she did not testify to at the hearing) wherein she returned home and noticed four galvanized nails where her car tires are usually parked. She alleged she was afraid for her life and her son's life.
On the same day the petition was filed, December 4, 2006, the trial court entered a temporary restraining order (Order of Protection) prohibiting Rousseau from harassing, stalking, following, or contacting Ms. Naquin in any way. He also was ordered not to go within 100 yards of Ms. Naquin's residence, her place of employment, or the school attended by her son. The TRO was effective until December 19, 2006, the date of the hearing. After the hearing, the trial court rendered an order of protection (permanent injunction) including, among others, the same conditions as the TRO. The trial court specified that the order was a "[La. C.C.P. art.] 3601-styled protective order" although the matter was filed as a "[La. R.S.] 46-styled protective order."
This appeal by Rousseau followed.

THE APPEAL
Significantly, in this appeal Rousseau raises absolutely no argument or defense in response to the evidence presented in support of the allegations of stalking, abuse, and harassment against him. Nor does his appeal assign error to or otherwise complain about the trial court's factual findings underlying the issuance of the protective order against him. His appeal rests on the same argument made in support of the motion for directed verdict that was rejected by the trial court.
In essence, Rousseau contends the trial court erred in issuing the protective order pursuant to La. C.C.P. art. 3603.1, as the matter was clearly brought under the provisions of Title 46. Rousseau asserts that, as recognized by the trial court, he does not fall within the category of persons against whom a protective order may issue pursuant to Title 46, as he was not, and had never been a family member, household member, nor a dating partner of Ms. Naquin. He argues, moreover, that even if he did fit in a category encompassed by the statutory scheme of Title 46, those statutes also require that the defendant have committed an act or a threat of violence, neither of which was alleged nor proven in this case. Therefore, Rousseau contends the trial court lacked authority to issue a protective order pursuant to La. C.C.P. art. 3603.1.
In lieu of an appellee brief, Ms. Naquin, still unrepresented, filed a letter addressed to this court stating that limitations on her finances prevented her from continuing to "fight this matter" but wanted this court to know that she continues to live in fear for her and her son's lives, "because [she is] very scared of the ramification of what [Rousseau] will do next." She requests that this court not lift the protection order and if it is within the court's power, she asks that we "extend the order."

ANALYSIS
In rejecting the foregoing argument presented by Rousseau in support of his motion for a directed verdict, the trial court commented:
[T]he Court believes that even though the petition was improperly  it's in the improper form because it's not a 46-styled protective order, it's a 3601 protective order, that error is not fatal because the contents are of such that it would put an individual on notice that there was [sic] stalking allegations. I mean, they even say in her facts, `He is constantly stalking me.' So it clearly puts [Rousseau] on notice that it's a stalking allegation, which is allowed or permissible under 3601 protective orders.
The hearing then continued with the presentation of Rousseau's testimony for the defense. In issuing the protective order and permanent injunction order, the trial court again rejected Rousseau's argument and found that the evidence provided a reasonable basis that would cause a reasonable person to be in fear of Rousseau's continued behavior, and that a protective order would be reasonable under the circumstances.
The injunction and protective order provisions in Title 46:2131 et seq. are found in the "domestic abuse assistance" section of the Protection From Family Violence Act, and are intended to provide a civil remedy for domestic violence that will afford the victim immediate and easily accessible protection. See La. R.S. 46:2131. As noted by the trial court and relied on by Rousseau on appeal, the abuse assistance provisions are limited in application to "family members" or "household members," defined in the act as "spouses, former spouses, ... and any person presently or formerly living in the same residence with the defendant as a spouse, whether married or not ..."; thus, they are inapplicable to this matter where the parties had no such relationship. See La. R.S. 46:2132(4).
On the other hand, the issuance of an injunction or protective order in general, and not within the limited scope of "domestic abuse assistance," is governed by the Louisiana Code of Civil Procedure art. 3601 et seq. In particular, La. C.C.P. art. 3603.1 provides in pertinent part:
A. Notwithstanding any provision of law to the contrary, and particularly the provisions of Domestic Abuse Assistance, Part II of Chapter 28 of Title 46, ..., no temporary restraining order or preliminary injunction prohibiting a spouse or other person from harming or going near or in the proximity of another shall issue, unless the complainant has good and reasonable grounds to fear for his or her personal safety or that of the children... .
* * * *
C. (1) A complainant seeking protection from domestic abuse, stalking, or sexual assault shall not be required to prepay or be cast with court costs, ... .
(2) When the complainant is seeking protection from domestic abuse, stalking, or sexual assault, the clerk of court shall make forms available for making application for protective orders, provide clerical assistance to the petitioner when necessary, provide the necessary forms, ....
(Emphasis added). And, as noted by the trial court, a 3601 protective order allows individuals involved in a stalking event with any person to apply for and obtain a Louisiana Protective Order Registry injunction.[2]
Rousseau does not dispute the existence of the foregoing provisions; rather, he maintains the court lacked authority to issue a protective order pursuant thereto because petitioner specifically filed a petition for an order pursuant to Title 46. This argument has no merit under well-established Louisiana law.
Louisiana has adopted the fact theory of pleading. La. C.C.P. arts. 854, 891, 1003, 1004. Where the facts pled are sufficient to give adequate notice of the claim or special defense to the opposing party, it is not necessary to specifically label that claim or special defense as such. Mulkey v. Stoney-Point Missionary Baptist Church, 462 So.2d 257, 260 (La. App. 1st Cir. 1984). Pleading the theory of the case is rejected and recovery may be had under any legal theory justified by the facts pleaded in the petition. Hughes v. Livingston Parish School Board, 459 So.2d 10, 12 (La. App. 1st Cir. 1984), writ denied, 462 So.2d 1250 (La. 1985) (Emphasis added). Moreover, courts should construe pleadings in such a manner as to achieve substantial justice. La. C.C.P. art. 865. To arrive at the truth and avoid miscarriages of justice, harsh, technical rules of pleading are not favored. Succession of Stevenson, 492 So.2d 100, 101 (La. App. 1st Cir.), writ denied, 494 So.2d 1178 (La. 1986). Courts must look beyond the style and caption of pleadings to determine their true nature. Recovery may be granted under any legal theory justified by the facts pled in the petition. Id., at p. 101. As long as the facts constituting the claim or defense are alleged or proved, a party may be granted any relief to which he is entitled under the pleadings and the evidence. Versai Management, Inc. v. Monticello Forest Products Corporation, 479 So.2d 477, 483 (La. App. 1st Cir. 1985).
Our review of the record reveals that the facts alleged in Ms. Naquin's petition, albeit filed on the Title 46 form, as well as the evidence presented at the hearing, meet the requirements for the issuance of a protective order pursuant to La. C.C.P. art. 3603.1, to wit, "the complainant has good and reasonable grounds to fear for his or her safety or that of the children." Additionally, the similarities between the two statutes, differing only in that Title 46 adds the requirement of certain familial relationship and a showing of violence, are sufficient to have put the defendant on notice of the facts underlying the allegations against him  stalking and harassment. Therefore, contrary to Rousseau's assertions, the trial court was well within its authority and acted appropriately in construing the petition as one properly filed and issued pursuant to La. C.C.P. art. 3603.1.

CONCLUSION
Accordingly, finding no merit in this appeal and no error in the trial court's issuance of a protective order in this matter, we affirm that order. Costs of this appeal are assessed to Mr. Rousseau.
AFFIRMED.
NOTES
[1] Inexplicably, the brief filed in this appeal was filed "on behalf of Robert Joseph Adams, Sr." a person wholly unrelated to this matter. The brief itself does not refer to defendant by name; however, it is clear from the content and subject matter of the arguments presented that it was meant to have been filed on behalf of Gerald Rousseau.
[2] See Louisiana Supreme Court website, www.lasc.org; Louisiana Protective Order Registry (LPOR), a court managed program, Quick Reference: Louisiana's Domestic Violence Statutes, p. 6, where La. C.C.P. art. 3601 is listed as an applicable statute.